IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
RITA MAE PERKINS, Individually and as      :
Personal Representative of the Estate of   :
WAYNE PHILIP PERKINS, Deceased,            :   No. 13-cv-08561-CM
                                           :
         Plaintiff,                        :
                                           :
   v.                                      :
                                           :
AIR & LIQUID SYSTEMS CORP., *et al.*,      :
                                           :
         Defendants.                       :
---------------------------------------------------------- x

## OWENS-ILLINOIS, INC.'S RULE 26(a)(2) DISCLOSURES

Owens-Illinois, Inc. ("Owens-Illinois") submits the following Rule 26(a)(2) Disclosure of Expert Testimony pursuant to the Court's Case Management Plan.[1] Owens-Illinois, by its attorneys Schiff Hardin LLP, discloses the following witnesses who may testify at trial by deposition or live testimony, and preserves its objections to Plaintiff's designations of prior testimony. Owens-Illinois may amend these disclosures in accordance with Federal Rule of Civil Procedure 26 and the Court's Scheduling Orders.

### I.
### RULE 26(a)(2) WITNESSES

1. Any Rule 26(a)(1) witness listed by Owens-Illinois to the extent that testimony is admissible under Rule 26(a)(2).

2. Any treating or diagnosing physician who treated or who has been identified by the Plaintiff or any other defendant to the extent that testimony is admissible and favorable to Owens-Illinois.

3. Any Rule 26(a)(2) witness listed by any other party to the extent that testimony is admissible and favorable to Owens-Illinois.

4. Subject to Rule 26(a)(2) and the Court's Scheduling Orders, the following witnesses may be called:

---

[1] Owens-Illinois' Rule 26(a) Initial Disclosures were filed on April 28, 2014. ECF No. 77.

**State of the Art Witnesses:**

Each state of the art witness below will testify regarding the development of knowledge regarding the potential health hazards of asbestos including the materials published in the literature and the significance of each within the context of the time it was published, the ACGIH's MAC/TLV or "safe level" of exposure to asbestos, the understanding of the exposures to finished insulation products sustained by workers in the field and the significance of those exposures in the context of the time they were published, and the general significance of publications about asbestos and any potential health hazards. Each witness may testify generally about the process by which medical knowledge evolved concerning exposure to asbestos and asbestos-containing products. They may testify concerning the historical "state of the art" regarding asbestos-related disease. Their testimony may include reference to both the published scientific and medical literature concerning asbestos and the so-called "Saranac" documents regarding Owens-Illinois Kaylo. In addition, they may offer testimony in response to the Plaintiff's allegation, if any, that there was a "conspiracy" among certain miners, manufacturers and sellers of asbestos and asbestos-containing products.

The gist of the testimony offered by these individuals will be that Owens-Illinois acted exemplarily in the context of the time; its conduct was reasonable based on the knowledge and information available at the time; it operated its Kaylo facilities within what was contemporaneously believed to be safe levels of exposure to asbestos and asbestos dust; that Owens-Illinois informed its work force that asbestos was potentially hazardous; that Owens-Illinois took substantial measures to minimize the amount of dust to which its employees were exposed; the scientific and medical literature at the time supported the conclusion that Kaylo was safe to make and use; that there was a "safe level" of exposure to asbestos and during the time Owens-Illinois was involved in the manufacture and sale of Kaylo it was established and believed that end users of products like Kaylo were not exposed above the "safe level"; and that it was reasonable, within the historical, scientific, and medical, context of the time, for Owens-Illinois to have manufactured its Kaylo product, and to sell that product without a warning relating to asbestos. These witnesses will also place all of Owens-Illinois's conduct within the proper historical, scientific, and medical, context of the time involved in these cases. Each witness may also discuss the history, career, and qualifications of Willis Hazard and Philip Drinker and the contributions each made to the developing the field of industrial hygiene. The testimony offered will also include the fact that no evidence of any agreement involving Owens-Illinois to suppress or misrepresent the health effect of asbestos is known to these witnesses. These witnesses may, discuss the asbestos content of Owens-Illinois Kaylo at any relevant time and how that product would react to various environmental conditions such as exposure to water. Further disclosure, to the extent appropriate is provided below:

1. **Peter Neushul, Ph.D., Visiting Researcher, Department of History University of California, Santa Barbara, CA 93106**

Peter Neushul, Ph.D. is an historian, engaged in teaching and consulting work in the History of Science, Technology and Medicine.

Dr. Neushul is expected to testify concerning state-of-the-art, the history of science and technology applicable to these cases, and the cultural history of the United States as applicable to

these cases. Dr. Neushul will testify about the development of knowledge concerning asbestos and asbestos-related diseases, the study of Kaylo performed by the Saranac Laboratory, and industrial hygiene principles, among other things.

Dr. Neushul is expected to testify concerning state of the art and the history of industrial hygiene applicable to these cases. He will explain industrial hygiene concepts, including but not limited to threshold limit values ("TLVs") and their impact on the development of knowledge. He will testify about the general use of asbestos-containing products in twentieth-century America. He also will testify about Owens-Illinois' actions in the 1940's and 1950's, including the Saranac Lake documents, the history of Owens-Illinois' development and manufacture of Kaylo, industrial hygiene procedures in place in the Kaylo factories and possible substitutes for asbestos, among other things.

Dr. Neushul may testify about Plaintiff's specific work history and/or the history of various worksites at issue in this case. He may testify about the extent of knowledge about asbestos hazards held by the U.S. Navy, other government agencies, Plaintiff's employers, unions and/or coworkers. He may testify about the effectiveness of warning labels. He may testify about respirator use.

Dr. Neushul is reimbursed for the time he spends in providing deposition testimony at the rate of $300 per hour.

2. **James E. Lockey, M.D., University of Cincinnati, Kettering Lab, 3223 Eden Ave., Cincinnati, Ohio 45267**

*See* the general state-of-the-art description above. Additionally, Dr. Lockey may provide testimony on Plaintiff's medical condition specifically (if he has been provided adequate records) and the general medical physician testimony as described below.

**Industrial Hygienists:**

1. **Earl D. Gregory, Ph.D., CIH, CSP, 5718 Yamasseo Dr., Hamilton, Ohio 45011**

Mr. Gregory is a Certified Industrial Hygienist and a Certified Safety Professional. He may provide testimony regarding his knowledge about, experience with and/or testing of asbestos-containing products. He may testify regarding exposure assessments performed on this Defendant's products or similar products. He also may rely on testing performed by other certified industrial hygienists and other data and literature available on various asbestos-containing materials.

Mr. Gregory may quantify Plaintiff's exposure to various asbestos-containing products manufactured by this Defendant or other companies, and provide opinions regarding the significance of each exposure. He may discuss historic uses of both this Defendant's and other companies' products and how they were manufactured. He may also provide testimony regarding the manner in which this Defendant's asbestos-containing products are used in the workplace or other alleged exposure settings. He may provide testimony about the type of asbestos fiber and

other fibers used in asbestos-containing products, as applicable to this case. He also will provide opinions and testimony regarding exposure from asbestos-containing products during reasonable foreseeable uses, and/or uses as alleged by Plaintiff.

Mr. Gregory will discuss ambient air exposure to asbestos, the sources of ambient air asbestos exposure, quantification studies and the presence of asbestos in various worksites. Mr. Gregory will discuss aerosol science as applicable to asbestos, including but not limited tore-entrainment, re-suspension, and fiber drift.

He will further provide testimony about the role of the industrial hygienist in assessing risk, generally, and with respect to asbestos-containing products, specifically. He will provide current and historical information regarding air and dust sampling methods and counting methods for asbestos in occupational settings. He will provide expert testimony on the proper use and application of all such methodology. He will also provide testimony regarding the proper and improper methods for occupational sampling of asbestos.

Mr. Gregory may testify regarding methods for controlling dust hazards in the workplace, as well as the development and acceptance of such standards. He may testify concerning Tyndall lighting methods. He will further provide testimony regarding governmental regulations affecting maximum allowable concentrations of asbestos exposure in an occupational setting, as well as the ACGIH threshold limit values and OSHA asbestos regulations.

Mr. Gregory will testify regarding the relative exposures with respect to the Plaintiff, including but not limited to threshold limit values, probable exposures to various asbestos-containing products, and the apportionment of exposure to asbestos-containing products.

Mr. Gregory charges $200 per hour for consultation and $300 per hour for deposition and trial testimony.

2. **William Dyson, Ph.D., Workplace Environments, LLC, P. O. Box 49176, Greensboro, NC 27419**

Dr. Dyson is an industrial hygienist. Dr. Dyson may testify about industrial hygiene and threshold limit values, product testing, emissions, development of knowledge regarding asbestos exposure, product warnings, and/or dust counting equipment and techniques. Dr. Dyson may discuss the relationship between scientific knowledge and the development of public policy and standards relating to asbestos exposure, and all aspects of government regulation of asbestos release and exposure. Dr. Dyson may also testify about the development of knowledge regarding the dose-response relationship between exposure to asbestos and disease, and other related matters.

Dr. Dyson is expected to testify about the general principles of industrial hygiene and the factors that are important to industrial hygiene studies. Dr. Dyson may testify about the historical studies and regulations regarding asbestos and industrial hygiene. He is expected to testify as to the manner in which experts can use industrial hygiene data and how the data should be interpreted in specific cases. Dr. Dyson is expected to testify as to the manner in which industrial hygiene data should be considered in evaluating exposures.

Dr. Dyson may also testify regarding industrial hygiene conditions where the facilities where the Plaintiff worked to the extent they were exposed to asbestos at such locations. Dr. Dyson may testify about the insignificance of the Plaintiff's alleged exposures to this defendant's product insofar as it relates to causation of the Plaintiff's alleged asbestos-related disease. In cases with sufficient information he will testify about the cumulative lifetime exposure dose and the significance, if any, any Owens-Illinois Kaylo exposure to that dose. Additionally, Dr. Dyson may testify consistent with his affidavit and report titled "Visibility of Asbestos Dust." He may discuss the asbestos content of Owens-Illinois Kaylo at any relevant time to this case and how that product would react to various environmental conditions such as exposure to water. Dr. Dyson may also testify about the effect of distance, and other environmental conditions, on the concentration of asbestos from insulation products to which the Plaintiff may have sustained.

3.  **Salvatore R. Dinardi, Ph.D., CIH, 40 Mallet Hill Road Columbia, SC 29223**

Dr. DiNardi is a Certified Industrial Hygienist and former Chair of the Environmental Health Sciences Department at the University of Massachusetts, Amherst. Dr. DiNardi has reviewed, among other materials, medical and scientific publications, documents related to the study of Kaylo performed by the Saranac laboratory, and depositions of former Owens-Illinois employees. Dr. DiNardi will testify about the development of knowledge concerning asbestos and asbestos-related diseases, the study of Kaylo performed by the Saranac Laboratory, and industrial hygiene principles, among other things.

Dr. DiNardi is expected to testify concerning state of the art and the history of industrial hygiene applicable to these cases. He will explain industrial hygiene concepts, including but not limited to threshold limit values ("TLVs") and their impact on the development of knowledge. He will testify about the general use of asbestos-containing products in twentieth-century America. He also will testify about Owens-Illinois' actions in the 1940's and 1950's, including the Saranac Lake documents, the history of Owens-Illinois' development and manufacture of Kaylo, industrial hygiene procedures in place in the Kaylo factories and possible substitutes for asbestos, among other things.

Dr. DiNardi may testify about the Plaintiff's specific work history and/or the history of various worksites at issue in this case. He may testify about the extent of knowledge about asbestos hazards held by the U.S. Navy, other government agencies, Plaintiff's employers, unions and/or coworkers. He may testify about the effectiveness of warning labels. He may testify about respirator use.

Dr. DiNardi is reimbursed for the time he spends in providing deposition testimony at the rate of $350 per hour.

4. **Nola Janice Kennedy, Ph.D. CIH. UCLA School of Public Health, Environmental Health Sciences Department, 650 Charles E. Young Drive, South Los Angeles, CA 90098-1772**

Nola Kennedy, PhD, CIH is a certified Industrial Hygienist. Professor Kennedy has a doctorate in Industrial Hygiene (Environmental/Aerosol Science). She teaches at the University of California—Los Angeles.

Professor Kennedy may provide testimony regarding her knowledge about, experience with and/or testing of asbestos-containing products. She may testify regarding exposure assessments performed on this Defendant's products or similar products. She also may rely on testing performed by other certified industrial hygienists and other data and literature available on various asbestos-containing materials.

Professor Kennedy may quantify Plaintiff/Plaintiff's exposure to various asbestos-containing products manufactured by this Defendant or other companies, and provide opinions regarding the significance of each exposure. She may discuss historic uses of both this Defendant's and other companies' products and how they were manufactured. She may also provide testimony regarding the manner in which this Defendant's asbestos-containing products are used in the workplace or other alleged exposure settings. She may provide testimony about the type of asbestos fiber and other fibers used in asbestos-containing products, as applicable to this case. She also will provide opinions and testimony regarding exposure from asbestos-containing products during reasonable foreseeable uses, and/or uses as alleged by Plaintiff.

Professor Kennedy will discuss ambient air exposure to asbestos, the sources of ambient air asbestos exposure, quantification studies and the presence of asbestos in various worksites. Professor Kennedy will discuss aerosol science as applicable to asbestos, including but not limited to re-entrainment, re-suspension, and fiber drift.

She will further provide testimony about the role of the industrial hygienist in assessing risk, generally, and with respect to asbestos-containing products, specifically. She will provide current and historical information regarding air and dust sampling methods and counting methods for asbestos in occupational settings. She will provide expert testimony on the proper use and application of all such methodology. She will also provide testimony regarding the proper and improper methods for occupational sampling of asbestos.

Professor Kennedy may testify regarding methods for controlling dust hazards in the workplace, as well as the development and acceptance of such standards. She may testify concerning Tyndall lighting methods. She will further provide testimony regarding governmental regulations affecting maximum allowable concentrations of asbestos exposure in an occupational setting, as well as the ACGIH threshold limit values and OSHA asbestos regulations.

Professor Kennedy will testify regarding the relative exposures with respect to the Plaintiff, including but not limited to threshold limit values, probable exposures to various asbestos-containing products, and the apportionment of exposure to asbestos-containing products.

Professor Kennedy charges $200 per hour.

**Medical Physicians and Doctors:**

Each general medical physician below may be expected to testify, in general, concerning asbestos-related diseases, the effects of exposure to asbestos upon a person or persons in general, including the epidemiology of asbestos-related diseases, and the link between use of tobacco products and various pulmonary and other diseases and conditions.

In addition, these physicians may testify about the necessary elements of a clinical diagnosis of asbestos-related disease, the complexities and scientific criteria associated with determination of cause-effect relationships between occupational exposures and lung or other pathology, the nature of various diseases and conditions, and the likelihood that such diseases or conditions will progress, recur, or predispose an individual to develop another related disease or condition.

Each physician below may testify concerning their diagnosis of the medical condition of the Plaintiff and whether his medical condition was caused by exposure to asbestos. Their testimony may also include their interpretation of the Plaintiff's x-ray films, pathology material and other medical records and diagnostic tests; the presence of other abnormalities or conditions unrelated to an exposure to asbestos; and epidemiological, radiological and general medical issues pertinent to the Plaintiff's condition.

These physicians may be expected to testify to the diagnosis of the Plaintiff's alleged medical condition, the effects of cigarette smoking, and whether the Plaintiff had a condition or illness associated with, or caused by, asbestos exposure. These witnesses may also testify about carcinogenesis, the significance or insignificance of the Plaintiff's alleged exposures to an Owens-Illinois product, whether there is a medical cause of the Plaintiff's condition, whether there is a sole proximate cause (or sole cause), and whether any alleged exposure to an Owens-Illinois product was/was not a substantial contributing factor in causing the Plaintiff's alleged condition.

In addition, these physicians may testify about the necessary elements of a clinical diagnosis of asbestos-related disease, the criteria associated with determining causal relationships between possible asbestos exposure and lung pathology, and the nature of various diseases and conditions. Further disclosure, to the extent appropriate is provided below:

1. **Allan Feingold, M.D., South Miami Hospital, 6200 South West 73rd Street, Miami, Florida 33143**

    Dr. Feingold is a specialist in pulmonary medicine and a NIOSH certified "B-reader". Dr. Feingold may testify about his examination of the Plaintiff and/or review of the Plaintiff's medical records and x-rays and may offer opinions regarding whether or not the Plaintiff had an asbestos-related disease. Dr. Feingold may also testify concerning the criteria used to diagnose asbestos-related diseases and prognosis regarding any alleged medical conditions. Dr. Feingold may also testify about general medical issues and the effects that asbestos and other substances have on human health generally and specifically with respect to the Plaintiff.

Dr. Feingold may testify about general and asbestos-related pulmonary medicine and epidemiology relevant thereto. He is expected to testify about pulmonary medicine and diseases in general, including smoking-related diseases and asbestos-related diseases. He may also testify regarding the Plaintiff's alleged medical conditions based on review of medical records, x-rays and the Plaintiff's expert reports. Additionally, he may testify about the relative pathogenicity of various forms of asbestos fibers, particularly chrysotile, concerning their propensity to cause mesothelioma.

Dr. Feingold will also testify as to the idiopathic nature of mesothelioma in some individuals. He will also testify that certain other cancers are not in reasonable medical probability related to asbestos exposure based upon the scientific evidence. These will include laryngeal and colon rectal cancers, among others.

Dr. Feingold may testify concerning the nature and extent of medical and scientific knowledge as it has existed from time to time regarding the association of pulmonary disease with asbestos exposure based upon the medical and scientific literature. Based on that literature's development over time, he will testify on the perceptions of which populations and workers were at risk of asbestos disease. He will also testify concerning diagnostic methods, and the incidence of lung cancer among individuals with asbestosis as compared to non-asbestotic workers and to the general public. He will also testify to smoking and its relation to cancer of the lung and cancer of other parts of the body. He will further testify concerning the lack of relationship between the presence of pleural plaques and later development of any form of cancer and the necessity for an underlying diagnosis for pulmonary asbestosis in order to attribute lung cancer to asbestos exposure. Dr. Feingold may offer testimony in response to any reports or testimony offered by the Plaintiff's experts.

2. **Joseph J. Renn, III, M.D., F.C.C.P., B.C.F.E., B.C.F.M., 439 Buckeye Road, Core, WV 26541**

Dr. Renn is a certified NIOSH B-reader. Dr. Renn may testify concerning the anatomy and function of the respiratory and circulatory system, the nature of asbestos, the disease process and diagnosis of asbestos and cancer associated with the respiratory system, the nature and extent of medical and scientific knowledge regarding the association of pulmonary disease with asbestos fiber exposure, the effect of exposure to substances other than asbestos on the development or manifestation of obstructive and restrictive conditions and diseases particularly in means of establishing the differential diagnosis of alleged asbestos diseases with other government warnings, smoking and other areas of the state-of-the-art, incidents of lung cancer among individuals with asbestosis compared with non-asbestos exposed workers and with the general population, and cigarette smoking and its effects on the lungs. Dr. Renn may testify concerning the examination and diagnosis of the physical condition of the Plaintiff and concerning the overall condition and relationship of that condition, if any, to the Plaintiff's alleged exposure to asbestos. He may also testify about the Plaintiff's prognosis or current condition as well as the Plaintiff's clinical presentation.

Dr. Renn will testify concerning state of the scientific and medical art in the history and knowledge of asbestos-related diseases and asbestos-related diseases in general, and the medical condition of the Plaintiff, epidemiology and general medicine regarding asbestos exposure. He

may also provide opinions on the probable time period(s) of asbestos exposure with relation to the causation of the disease mesothelioma. In doing so, he will also provide percentages of probability of causation for exposure to asbestos from first exposure to last exposure. As a basis for opinion, he will rely in part upon scientific papers published by Peto, Seidman and Selikoff, Morgan and Lampshear, among others. Dr. Renn may also testify regarding the state of scientific and medical knowledge during the time asbestos was used commercially in high temperature insulation products. Dr. Renn will testify about his review of the medical records and other reports in this case. He will discuss Mr. Steineke's condition and his condition after the surgeries and treatments for his mesothelioma. He may testify regarding cause of medical condition and whether the extent to which the Plaintiff's particular exposures to asbestos-containing materials caused his/her injury.

3. **Lawrence N. Weiss, M.D., Division of Pathology, City of Hope National Medical Center, 1500 E. Duarte Drive, Duarte, CA 91010**

Dr. Weiss is a Senior Consulting Pathologist at Clarient Pathologist Services and Chairman of Pathology Emeritus at City of Hope National Medical Center. He received his bachelor's degree from the University of Maryland in 1976 and his medical degree from the University of Maryland School of Medicine in 1981.

It is expected that Dr. Weiss will testify concerning the process by which normal cells get altered and ultimately result in the formation of cancer. It is expected that he will testify that cancer starts in a single cell. It is also expected that he will testify concerning the process by which a normal mesothelial cell is damaged and ultimately results in a malignant mesothelioma. Dr. Weiss is expected to testify that not all exposures to asbestos contribute to the causation of a malignant mesothelioma. Rather, when asbestos does cause malignant mesothelioma, based upon the most relevant available science, it is the asbestos fibers that are in the immediate proximity of the cell that becomes malignant that are the cause of the malignant mesothelioma. In those cases where asbestos is the cause of a malignant mesothelioma, it is not possible to determine which exposure to asbestos fibers caused the malignant mesothelioma to develop. Dr. Weiss is not expected to testify as to his examination of any pathology material specific to Plaintiff in this case, but may testify in response to opinions of pathologists who have examined Plaintiff's tissue.

Dr. Weiss is reimbursed for the time he spends in providing deposition and trial testimony at the rate of $500.00 per hour.

4. **Lee Sider, M.D.; University of Medicine & Dentistry of New Jersey; 150 Bergen St. C-320; Newark, New Jersey 07103**

Dr. Sider will offer testimony regarding the following: medical literature relating to medical conditions and asbestos; causes of medical conditions reported by the Plaintiff; the Plaintiff's condition and its cause from a review of medical records, slides, tests, and other materials and information, and from examination of the Plaintiff, to the extent undertaken. Dr. Sider will testify about his review of the medical records/chest films in this case, and is expected to testify consistent with the opinions disclosed in his report that has been produced. In addition, Dr. Sider is expected to testify regarding the following matters and areas:

    a.    the nature of asbestosis;

    b.    the nature and extent of medical and scientific knowledge regarding any association between certain medical conditions and asbestos exposure;

    c.    the state of scientific and medical knowledge over time regarding asbestos;

    d.    the history, evolution, and knowledge of asbestos and disease;

    e.    handling of asbestos products, cigarette smoking, and other causes of conditions which allegedly affect the Plaintiff;

    f.    lack of exposure, *de minimis* or low-dose exposure, and in particular, lack of exposure causing the Plaintiff's condition;

    g.    causation or lack thereof of the alleged condition of the Plaintiff due to exposure to particular product(s);

    h.    medical literature relating to different medical conditions and asbestos, including the Plaintiff's alleged medical condition;

    i.    the Plaintiff's medical condition, its diagnosis, its nature, its seriousness, its cause, and its treatment and prognosis from a review of medical records, radiology materials, pathology slides, tests, and other materials and information, and from examination of the Plaintiff, to the extent undertaken; and

    j.    whether or the extent to which a particular product did or did not contain asbestos.

**5.**    **Peter Barrett, M.D., Clinical Professor of Radiology, Tufts University School of Medicine, 300 Boylston Street, Suite 714, Boston, MA 02116, (617) 426-2110**

Dr. Peter Barrett is a practicing radiologist, B-reader and clinician. He may provide testimony regarding the Plaintiff's x-rays, CT-scans and other diagnostic tools so as to provide an opinion whether the Plaintiff has an asbestos-related disease. He will also review the ILO classification system for chest films and its role and function in evaluating the pneumoconiosis in general, and asbestosis in particular, and may also include a review of the medical records and other clinical information regarding the Plaintiff to provide an opinion as to whether the Plaintiff had an asbestos-related disease.

With respect to the Plaintiff, he may testify as to his review and interpretation of x-ray films, review and interpretation of pulmonary function testing, the nature and extent of any impairment or disability, whether a condition is progressive and whether other diseases or conditions were present in the Plaintiff. He will testify regarding the existence or non-existence of any alleged asbestos-related disease in the Plaintiff, including but not limited to pleural

changes, asbestosis, lung cancer, mesothelioma, laryngeal cancer, esophageal cancer, gastrointestinal cancer, and other forms of cancer where applicable.

He will also testify on general medicine issues regarding asbestos-related diseases including, but not limited to, lung physiology, lung function, lung defense mechanisms and the mechanisms by which asbestos fibers do or do not cause a particular disease. He may also testify on increased risk of cancer issues and whether the Plaintiff has a reasonable fear of cancer due to exposure to asbestos. He may also testify on the health consequences of smoking and the relationship between smoking and alleged asbestos-related diseases, generally and with respect to the Plaintiff. He will testify regarding the contributions if any, of smoking, asbestos, and other environmental or occupational or hereditary or other factors, if any, to the Plaintiff's disease. He may also testify as to whether the Plaintiff suffers from other diseases or conditions unrelated to asbestos exposure, and the impact of such disease or conditions on functional impairment or disability or life expectancy.

He will further testify regarding the epidemiology of asbestos diseases, the criteria for diagnosis of asbestos-related disease, as well as the existence of a dose response relationship between exposure to asbestos and asbestos-related diseases. He may further testify regarding the differing propensity of various asbestos fiber types to contribute to mesothelioma or other asbestos-related disease. He may also testify regarding the determination of the relative risks of suffering personal injury or death as a result of exposure to asbestos-containing products sold or installed by this defendant. It is also his opinion that the non-occupationally exposed general public is not at risk for the development of an asbestos-related condition or disease, even though there is asbestos in the ambient air. Thus, because of the large dose needed to cause an asbestos-related disease, a single asbestos fiber does not contribute to disease. He may also testify regarding government regulations applicable to Defendant's products.

6. **Michele Carbone, M.D., Ph.D., Professor of Pathology, Director Thoracic Oncology Program, Associate Director for Basic Services, Cancer Research Center of Hawai'i, 651 Tialo Street, Suite 231, Honolulu, Hawai'i, 96813-5534, (808) 440-4596**

Dr. Carbone is a pathologist. He may testify, live or by deposition, concerning his review of the medical records, pathology and/or work history of the Plaintiff, the Plaintiff's medical condition, diagnosis, and the cause of the Plaintiff's medical condition. His testimony may include his analysis of immunohistochemical stains, histochemical stains, electron microscopy, fiber burden analysis, x-18 translocation tests, genetic testing, and p-16 methylation studies. His testimony may also include discussion of asbestos and its effect on human health generally and the Plaintiff's specifically, and the effect that other substances have on human health generally and the Plaintiff's condition specifically, including the polio vaccine and the SV-40 contaminant. Dr. Carbone may also testify regarding the medical conditions of the Plaintiff based on review of medical records, x-ray reports, the Plaintiff's experts' reports and supplemental reports and his training, experience and other special expertise. Further, Dr. Carbone may testify concerning the increased risk, if any, of cancer faced by asbestos exposed workers and the prognosis of such individuals. He may testify regarding cause of medical condition and whether the extent to which the Plaintiff's particular exposures to asbestos-containing materials or SV-40 caused his/her injury. He may also testify regarding the immunohistochemical staining process and results of

staining performed on the Plaintiff's tissue samples, molecular studies, EM studies, as well as any fiber burden or digestion studies performed. Furthermore, Dr. Carbone may testify about the presence of the SV-40 virus in the Plaintiff's pathology specimens and results of PCR analysis. He may also testify about the many causes of cancer and cancer causes in general. He may also testify about the issue of idiopathic/unknown etiology of cancer.

In addition, if called to testify, either live or by deposition, Dr. Carbone is expected to provide testimony regarding the areas stated below:

1. the anatomy and function of the respiratory and circulatory systems, including the protective systems of the body with regards to the inhalation and retention of dust, and the diagnosis and treatment of disease affecting such systems;

2. the nature of asbestos and asbestos-related diseases;

3. the symptomatology, disease process and diagnosis of asbestosis and cancer associated with the respiratory system, peritoneum and peritoneal cavity;

4. the nature and extent of medical and scientific knowledge regarding any association of obstructive pulmonary disease with asbestos fiber exposure;

5. the effect of exposure to substances other than asbestos on the development and manifestation of obstructive and restrictive conditions and diseases of the respiratory system and other causes of obstructive and restrictive disease or defects of the respiratory system;

6. methods of diagnosis of various diseases, especially the means of establishing the differential diagnosis of alleged asbestos-related diseases with other non-asbestos-related diseases;

7. incidence of lung cancer among individuals with asbestosis or asbestos exposure as compared to non-asbestotic asbestos workers, non-asbestos exposed workers and to the general population;

8. cigarette smoking and its effects on the lungs and other organs;

9. the relationship of cigarette smoking to cancer of the lung and cancers of other body parts with reference to epidemiology studies and physiologic effect;

10. the difference between impairment and disability;

11. the effect of asbestosis or other asbestos-related disease, or asbestos exposure without asbestosis or other asbestos-related disease, on disability and life expectancy;

12. the lack of relationship between the presence of pleural plaques and a later development of any form of cancer;

13. the history of evolution and knowledge of asbestos related diseases;

14. the import of any exhibit introduced as evidence, or any items prepared for use or used for demonstrative purposed by any witness;

15. cancer incidence in the general population and among asbestos workers and its potential causes, including but not limited to SV-40;

16. the incidence of mesothelioma among various kinds of workers exposed to asbestos, and the relative importance of various fiber types and the cause of mesothelioma; and

17. causation of cancer in this case, including the absence of pathologic and other evidence in this case sufficient to implicate any Owens-Illinois product as a cause or the cause of the Plaintiff's cancer;

18. the scientific methods to be used in attributing causation of an asbestos-related cancer to a particular exposure or series of exposures, including exposures to a particular asbestos-containing product or products;

19. molecular biology and causation of mesothelioma as it relates to SV-40;

20. DNA sequencing and testing for different forms of cancer, including mesothelioma and the SV-40;

21. to the extent not covered above, general medical principles and ethic, proper treatment and diagnosis of mesothelioma, asbestos medicine in general, as well as SV-40 in general.

7. **Dr. Elliot Kagan, 4 Royal Oak Court, Potomac, Maryland 20854-2654**

Dr. Kagan, if called to testify, is expected to provide testimony concerning the anatomy and function of the respiratory and circulatory systems; examinations conducted and opinions regarding tissue samples of Plaintiffs; the symptomatology, disease process and diagnosis of asbestosis and cancer of the respiratory system, peritoneum and peritoneal cavity; the nature and extent of medical and scientific knowledge regarding any association of pulmonary disease with asbestos fiber and the effect of exposure to substances other than asbestos in the development and manifestation of diseases of the respiratory system; the methods of diagnosis and means of establishing the differential diagnosis of asbestos-related diseases with non-asbestos related diseases; the incidence of lung cancer in the general population and those individuals exposed to asbestos; cigarette smoking and its effects on the lungs; the difference between impairment and disability; the effect of asbestosis on disability and life expectancy; the lack of relationship between pleural plaques and development of any cancer; the history, evolution and knowledge of asbestos-related diseases; and the evolution of the medical communities' awareness of the increased risks for an asbestos-related disease in the cases of prolonged exposure.

Dr. Kagan, if called to testify, may testify regarding his review of the Plaintiff's medical records and diagnosis of the physical condition and relationship, if any, between the Plaintiff's

exposures to asbestos. He may also testify regarding the immunohistochemical staining process and results of staining performed on the Plaintiff's lung tissue samples, as well as any fiber burden or digestion studies performed.

Dr. Kagan may testify in the area of the medical and scientific aspects of exposure to dust as produced by asbestos-containing products and the development of asbestos-related disease generally. He may testify regarding cause of medical condition and whether the extent to which the Plaintiff's particular exposures to asbestos-containing materials caused his/her injury. Dr. Kagan is also expected to testify consistent with his report attached hereto.

8. **James E. Lockey, M.D., M.S., Department of Environmental Health, University of Cincinnati College of Medicine, Cincinnati, OH 45267-0182**

James E. Lockey, M.D., M.S. is an Associate Professor and an expert in industrial hygiene at the Department of Environmental Health, University of Cincinnati.

Dr. Lockey is expected to testify as to state of the art, health implications of fiber emissions in the workplace, issues of his specialty as applicable to medical issues presented by this case, and concerning information which various defendants received through the Saranac Lake Laboratory reports.

Dr. Lockey is reimbursed for the time he spends in providing deposition testimony at the rate of $400 per hour. Deposition/trial testimony outside of Cincinnati, Ohio is $2,000/day.

9. **Randall Rosenblatt, M.D., Medical Director, Baylor Regional Transplant Institute, 621 N. Hall Street, Suite 120 Dallas, TX 75226**

Randall Rosenblatt, M.D., is a licensed physician and a Medical Director at Baylor Regional Transplant Institute.

Dr. Rosenblatt will testify concerning plaintiff's medical condition, expected future course, life expectancy, and expected quality of life with and without any asbestos-related disease.

Dr. Rosenblatt is reimbursed for the time he spends in providing deposition and trial testimony. Dr. Rosenblatt's rate is currently unknown by counsel, but believed to be approximately $350 per hour for testimony.

10. **Larry A. Feig, Ph.D., Jaharis 613 Tufts University School of Medicine, Department of Biochemistry, 150 Harrison Avenue Boston, MA 02111**

Dr. Feig graduated from Columbia University with a B.S. in chemical engineering in 1974. He received his M.S. in 1976 from Massachusetts Institute of Technology in chemical engineering and his Ph.D. in physiology from Harvard University in 1982. After receiving his Ph.D., Dr. Feig was a Research Fellow in Pathology at the Dana-Farber Cancer Institute in the Laboratory of Molecular Carcinogenesis. He was a Research Fellow from 1982 to 1987.

In 1987, he became an Assistant Professor in the Department of Biochemistry at Tufts University School of Medicine and in 1993 became an Associate Professor in the Department of Biochemistry. In 1997, Dr. Feig became a full Professor in the Department of Biochemistry and then, in 2003, a Professor in the Department of Neuroscience at Tufts University. In 2005, he became the Associate Director for Basic Science at the Tufts Medical Center Cancer Center. Dr. Feig is published in over 60 articles in peer reviewed journals.

Dr. Feig's work is in basic research relating to the causes of cancer at the molecular level. As a part of that work, Professor Feig supervises a team of researchers in his laboratory whose goal is to reveal how genetic changes in normal cells converts them into tumor cells. As Associate Director of the Tufts Medical Center Cancer Center he oversees all research laboratories at Tufts Medical School and Tufts Medical Center that use either cell-based or animal-based models of cancer to find and test new targets for cancer therapy.

It is expected that Dr. Feig will testify concerning the process by which normal cells get altered and ultimately result in the formation of cancer. It is expected that he will testify that cancer starts in a single cell. It is also expected that he will testify concerning the process by which a normal mesothelial cell is damaged and ultimately results in a malignant mesothelioma. Dr. Feig is expected to testify that not all exposures to asbestos contribute to the causation of a malignant mesothelioma. Rather, when asbestos does cause malignant mesothelioma, based upon the most relevant available science, it is the asbestos fibers that are in the immediate proximity of the cell that becomes malignant that are the cause of the malignant mesothelioma. In those cases where asbestos is the cause of a malignant mesothelioma, it is not possible to determine which exposure to asbestos fibers caused the malignant mesothelioma to develop. Dr. Feig is not expected to testify as to his examination of any pathology material specific to plaintiff in this case, but may testify in response to opinions of pathologists who have examined plaintiff's tissue.

Dr. Feig's opinions are based upon his knowledge, training, experience and may be based upon his review of case specific materials, including the medical records, pathology materials, and/or work history of Plaintiff. Dr. Feig is reimbursed for the time he spends in providing deposition and trial testimony at the rate of $450.00 per hour.

11. **Victor Roggli, M.D., Duke University Medical Center, Department of Pathology, P.O. Box 3712, Durham NC 27710, (919) 286-0411**

*See* the general medical physician description above. Additionally:

Dr. Roggli is a pathologist who will testify about the causes of cancer, mesothelioma and other asbestos-related diseases. He also may testify regarding his examination of pathology specimens and other case-specific materials including but not limited to x-rays, ct scans, pulmonary tests, other medical records, deposition testimony, and other documents. Such testimony will include the nature of asbestos and asbestos-related diseases generally; the nature of any disease or injury which the Plaintiff might have contracted; the issues of causation – or lack thereof – between any exposure to asbestos fibers and asbestos-containing products

generally and products at issue in this case specifically; the medical conditions of the Plaintiff; and asbestos medicine in general.

    **12.**    Owens-Illinois reserves the right to call any medical doctor who has prepared a report in this case, any Defense Medical Trust expert, and/or was otherwise disclosed or tendered by another party.

**Other Experts:**

    **1.**    **Dr. Charles A. Weaver III, Department of Psychology and Neuroscience Baylor University, Box 97334, Waco, Texas 76798-7334, (254) 710-6750**

Dr. Weaver is an expert in the areas of human memory and cognition. His research interests include memory, the relationship between confidence and memory, eyewitness memory and the effect of misleading information, "flashbulb memory," and repression and the false memory syndrome. Dr. Weaver earned his undergraduate degree from Baylor University in 1984, and obtained his masters and doctorate degrees in Psychology from the University of Colorado, Boulder. Dr. Weaver is a full professor of Psychology and Neuroscience at Baylor University in Waco, Texas, where he has taught since 1989. Dr. Weaver also serves as an associate editor of the Journal of Experimental Psychology: Learning, Memory, and Cognition, and is a member of the Professional and Scientific Advisory Board of the False Memory Syndrome Foundation.

If called to speak to the jury, Dr. Weaver will discuss the nature of memory, recall and retention. He will rely on general principles in the field of psychology and neuroscience and apply them to the factual allegations presented by the Plaintiff and other fact witnesses. Dr. Weaver will discuss the probability that specific factual information pertaining to a work environment could be retained over a period of two to four decades. He will draw upon his understanding of the physical and biological limitations of memory creation and retention, and the likelihood that after-event stimulus may generate inaccurate or false memories. He will discuss the manner in which "false memories," a term used by psychologists and researchers in the field, can be imprinted and how those memories can rise to the level of an actual memory despite being incorrect. Dr. Weaver will define for the jury in scientific and medical terms human memory, which he describes as a dynamic, creative and reconstructive process. He will discuss memory in terms of "encoding" information, and will describe how memory can be altered by the conditions present when generation or retrieval of memory occurs, for example, due to a leading question presented by an attorney, materials offered to "refresh recollection," or conversations that suggest certain events took place that were unknown to the individual whose memory is being generated. Dr. Weaver will discuss how memories can be altered by events which take place or information which is learned after the original circumstances. He will relate how the more a memory is retrieved or rehearsed, the greater the person's subjective confidence in the accuracy of the memory, but that increased confidence does not necessarily lead to improved memory accuracy. Dr. Weaver will also discuss his laboratory research and discuss his findings, and the results of studies available in the published literature, that support his opinions. Dr. Weaver will also testify consistent with any report prepared in any specific case.

2.  **Lambertus Hesselink, Ph.D., CIS-X Building, Rm 325, Stanford University, Stanford, California 94305**

Lambertus Hesselink is a Professor of Electrical Engineering, and by courtesy, the Applied Physics and Aeronautics and Astronautics Departments at Stanford University. Dr. Hesselink is an expert in optics and light scattering and has considerable expertise in using optical systems and light scattering principles to characterize fluid and flow dynamics.

Dr. Hesselink is a named inventor in over 85 patents and pending applications covering various aspects of optical data storage, optical processing, nano-optics, holography, and Internet-related technologies. Dr. Hesselink also served as an invited member of the Image Processing Ad Hoc Committee to make recommendations to NASA to solve the imaging problems that plagued the Hubble Space Telescope when it was first launched.

Dr. Hesselink may testify regarding the videos of experiments conducted by Dr. William Longo and Richard Hatfield (studies hereinafter collectively referenced as "Dr. Longo") involving asbestos-containing products, including the "Tyndall light" portions of those videos and the underlying data on the sizes and morphologies of the asbestos fibers detected in those studies by electron microscopy. Dr. Hesselink will explain the actual physics behind the high intensity, or "Tyndall lighting," used by Dr. Longo to accentuate the dust particulates in the air during his studies. He will also testify regarding the optical system used by Dr. Longo to record his experiments, including its specifications and limitations. He will testify that the individual asbestos fibers that Dr. Longo measures by electron microscopy from air samples taken during his experiments are too small to be seen and recorded by the cameras used by Dr. Longo under his high intensity lighting scheme. He will testify that the amount of light scattered off of the individual asbestos fibers that Dr. Longo measures by electron microscopy from air samples taken during his experiments is too small to be seen and recorded by the cameras used by Dr. Longo. Thus, Dr. Hesselink will testify that none of the individual discrete spots or points of light seen on the videotapes of his experiments result from asbestos fibers of the size that Dr. Longo measures in those experiments. In fact; the discrete spots of light are likely generated by particles or aggregates that are hundreds of microns in size, far larger than the respirable range. Dr. Hesselink will also testify that none of the "fog" or "haze" seen on the videotapes that he has reviewed results from a "cloud" of asbestos fibers of the size and at the concentration that Dr. Longo measures during his experiments. In short, the optical system utilized by Dr. Longo to record his experiments is too insensitive by orders of magnitude to record the light scattered from asbestos fibers of the size that Dr. Longo measures in his experiments at the concentrations that he reports. Dr. Hesselink will testify that the videotapes of Dr. Longo's experiments do not depict or "visualize" any of the asbestos fibers that he measures from air samples taken during his experiments by electron microscopy.

Dr. Hesselink will also comment on prior representations that Dr. Longo has made regarding what his videotapes depict. He will also comment on a September 8, 2005 letter provided by Dr. Phillip Russell, a business partner of Dr. Longo's, which claims that asbestos fibers that are 0.02 to 0.05 micron in diameter are capable of being visualized under Dr. Longo's Tyndall lighting set-up. Dr. Hesselink will testify that both Dr. Longo's claims regarding the capability of his videos to depict respirable asbestos fibers that he counts on his filters and Dr. Russell's claims in his September 8, 2005 letter are incorrect.

Dr. Hesselink charges $485.00 per hour for his time.

3.   **William A. Lowell, 45 Sixth Avenue, Augusta, ME, 04330**

Mr. Lowell is a Marine Engineer. Mr. Lowell graduated from Maine Maritime Academy with a degree in Marine Engineering and holds a Chief Engineer license in the Merchant Marine.

Mr. Lowell will testify generally about the subject of naval architecture and specifically as to U.S. Naval and merchant vessel design, construction, overhaul, repair, maintenance, conversion, activation, deactivation, etc. He is familiar with plans, working drawings, insulation schedules, Navy manuals and specifications for construction and overhaul and repair of U.S. Navy and merchant vessels. He is expected to testify concerning the use of asbestos-containing materials on board ship, work practices in ship construction and repair, Navy regulations and practices regarding the use of insulation products and the types of asbestos products required by various Navy specifications and manuals. He has also examined documents which relate to construction and overhaul and repair of U.S. Naval and merchant vessels. He is familiar with and will testify concerning Navy and military specifications for the types and quantities of materials used in naval construction and repair including insulation materials. He also will testify as to the specifications, including the types and grades, which Kaylo pipe-covering and block met. He will testify regarding the practices of the government in leasing ships to private shipping companies, and the maintenance practices during the lease periods, the history of the ships involved in this case and their maintenance and relevant records.

Mr. Lowell is reimbursed for the time he spends in providing deposition testimony at the rate of $175 per hour.

4.   **Robert L. Kline. 11917 Kingbird Court Penn Valley, CA 95946**

Mr. Kline is a Maritime Consultant. He received a degree in Naval Science from the U.S. Naval Academy in 1961, and a degree in Mechanical Engineering from the Naval Post Graduate School in 1967. He obtained the rank of Captain during a 30 year naval career.

Mr. Kline will testify generally about the subjects of naval construction, repair and operations, specifically as to U.S. Naval design, construction, overhaul, repair, maintenance, conversion, activation, deactivation, etc. He is familiar with plans, drawings, insulation schedules, Naval manuals and specifications for construction, overhaul and repair of U.S. Navy vessels. He is expected to testify concerning the use of asbestos-containing materials on board ship and in shipyards, work practices, ship construction and repair, Navy regulations, and other practices regarding insulation products, as well as the types of asbestos products required for various Navy specifications and manuals. He has also examined documents which relate to construction and overhaul and repair of U.S. Naval vessels. He is familiar with and will testify concerning Navy and military specifications for the types and quantities of materials used in Naval construction and repair, including insulation materials. He also will testify as to the specifications, including types and grades, which Owens-Illinois' Kaylo pipe covering and block satisfied. He will testify regarding the history of the ships involved in this case and their maintenance and relevant records. Mr. Kline also may testify about the tasks plaintiff was likely

to perform and the spaces plaintiff likely worked given plaintiff's rank, as well as the tasks plaintiff was not likely to perform and the spaces he was not likely to work.

Mr. Kline is reimbursed for the time he spends in providing deposition testimony at the rate of $250.00.

## II.
## RESERVATIONS

Owens-Illinois reserves the right to supplement or amend this disclosure to the extent that discovery of experts and fact witnesses disclosed by the Plaintiff has not been completed. The failure to complete said discovery is not due to any fault or lack of diligence on the part of Owens-Illinois, but rather is due to the constraints imposed by a very tight scheduling Order, approaching trial dates, the scope of the expert's purported expertise, and unavailability of experts for deposition.

Because discovery is ongoing, the need for additional expert testimony may arise in order to rebut the facts and opinions to which the Plaintiff's experts may testify. Owens-Illinois will supplement its disclosures in accordance with Rule 26.

Owens-Illinois reserves the right to call expert opinion and fact witnesses who may be listed by codefendants or the Plaintiff to the extent that testimony is admissible and favorable to Owens-Illinois. Owens-Illinois adopts the disclosure of all codefendants to the extent that testimony is admissible and favorable to Owens-Illinois. Owens-Illinois also hereby reserves the right to call those expert witnesses listed by the Plaintiff.

Owens-Illinois further reserves the right to call as witnesses any individuals necessary to authenticate social security records, tax records, military records, union records, personnel records, sales/shipment/delivery records, or medical records.

Dated: July 10, 2014

Respectfully submitted,

By: _____
Paul A. Scrudato
Jill Berry
Schiff Hardin LLP
666 Fifth Avenue, 17th Floor
New York, NY 10103
(212) 753-5000
(212) 753-5044 (facsimile)
pscrudato@schiffhardin.com
jberry@schiffhardin.com

*Attorneys for Defendant Owens-Illinois, Inc.*

18946-3370
NY\52145225.1